# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

**CLYDE LONG,**

        **Plaintiff,**

**v.**                                                  **Case No. 3:07-cv-340**
                                                     **Judge Thomas M. Rose**

**ROBERT M. GATES, Secretary of Defense,**

        **Defendant.**

---

## ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 14)

---

       This matter is before the Court on Defendant Robert Gates's motion for summary judgment (Doc. 14). Evidence relating to the motion was filed by Defendant (Docs. 14-1; 16; 16-1) and by Plaintiff Clyde Long (Docs. 18-1 to 18-5; 19).[1] The motion has been fully briefed and is now ripe for decision.

       Plaintiff's complaint (Doc. 1) alleges three Causes of Action: First, that Defendant unlawfully retaliated against Plaintiff, in violation of 42 U.S.C. § 2000e-3, for Plaintiff's active participation in his wife's sexual harassment claim; Second, that Defendant's retaliation against Plaintiff for participating in his wife's claim created a "hostile work environment;" and Third, that the hostile work environment Defendant created was "so intolerable" that Plaintiff was forced to quit, amounting to a "constructive discharge." Doc. #1, ¶¶ 16-33.

---

[1] The Court notes that the Deposition of Antonio Andre included in Document 19 is not signed or dated by the court reporter as required by Fed. R. Civ. P. 30(f)(1). However, this document is not significant to the Court's analysis of the instant motion.

Although framed as distinct claims, Plaintiff's three Causes of Action are merely different elements of a single "Title VII" retaliation claim--constructive discharge is the injury caused by Defendant's alleged reprisal.[2]  Plaintiff admits this in his memorandum opposing the instant motion.  Doc. 18 at 1 n.1 ("Plaintiff's lawsuit is based on [D]efendant's reprisal, which proximately caused his constructive discharge. . . .").

Plaintiff seeks unspecified relief under Title VII of the Civil Rights Act of 1964; unspecified relief "cognizant of the compensation, terms, conditions, and/or privileges of employment that Plaintiff would otherwise have realized and enjoyed but for Defendant's discriminatory and unlawful conduct;" unspecified "employment, reinstatement, promotion, restitution, restoration of the status quo, front pay, back pay, fringe benefits, insurance benefits, pension, or other vesting benefits;" compensatory damages "in excess of $500,000.00;" and unspecified "attorneys fees, costs, expenses, and/or the reasonable consideration and compensation of Plaintiff's loss of dignity and reputation, his experience of humiliation and embarrassment[,] and the deprivation of his employment and livelihood."  Doc. 1 at 5.

Defendant Robert Gates is a party in his official capacity as the Secretary of Defense of the United States of America, and was Plaintiff's employer for purposes of this action.[3]

This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiff alleges violation of a federal law (42 U.S.C. § 2000e *et seq.*).

---

[2] On April 4, 2006, Plaintiff began an administrative process in which he raised four, independent retaliation claims based on his suspension (Jan. 2006), lower-than-expected performance rating (Aug. 2005), constructive discharge (Feb. 2006), and change in work schedule (Aug. 2005). Doc. 16-1, Ex. C-2, at 23-24. Plaintiff's claims for the performance rating and schedule change were time-barred by 29 C.F.R. § 1614.107(a)(2) and dismissed by the Defense Commissary Agency Equal Employment Opportunity Office. *Id.* If those untimely claims were brought here, dismissal would be appropriate since failure to contact an EEO officer within 45 days of an illegal employment act is an affirmative defense. *See Horton v. Potter*, 369 F.3d 906, 910 (6th Cir. 2004). However, Plaintiff is not prohibited from citing those acts as examples of allegedly retaliatory or intolerable treatment in a timely constructive discharge claim, which is the case here.

[3] "Gates;" the "Department of Defense;" and Plaintiff's unit, the "Defense Commissary Agency," are used interchangeably throughout this opinion.

2

**I. Factual Background**

Plaintiff, after retiring from active military duty, had been an employee and manager/administrator of commissaries at McChord Air Force Base, in Washington, and Mountain Home Air Force Base, in Idaho, before being reassigned to the Wright-Patterson Air Force Base Commissary, in Ohio, in May 2004. Doc. 16 (Deposition of Clyde Long) at 18-24. Plaintiff was promoted to "Store Manager" of the Wright-Patterson Commissary about a year later in May 2005. *Id.*

On two occasions, in March 2005 and late-May 2005, Plaintiff and his wife were shopping together at the Wright-Patterson Commissary when Plaintiff's indirect supervisor, Store Director Antonio Andre, allegedly made inappropriate sexual comments to Plaintiff's wife.[4] Doc. 16, Long Dep. 27-38. On July 25, 2005, Plaintiff's wife sent a letter to Bonnie Kanitz, Director of the Defense Commissary Agency (DeCA), complaining about Andre's sexual harassment. Doc. 16, Long Dep. 26; Doc. 16-1, Ex. A; Doc. 18-4, Ex. F-14 at 118-19. On August 4, 2005, Plaintiff's wife delivered a copy of that letter to Dale Turpin, a Zone Manager in the "DeCA East Region," Andre's direct superior. Doc. 18-4, Ex. F-14 at 121.

On August 14, 2005, Defense Commissary Agency equal employment opportunity representatives questioned Plaintiff and his wife about the incidents. *Id.* Plaintiff claims that answering these questions and generally supporting his wife's harassment claim were protected actions for which he suffered unlawful retaliation.[5] *Id.*, Ex. F-15 at 131.

---

[4] Plaintiff's wife was not an employee of the commissary or professionally affiliated with Andre. She is not a party to this action.

[5] In light of recent Sixth Circuit action, the Court ordered the parties to brief the issue raised in *Thompson v. North American Stainless, LP*, 567 F.3d 804 (6th Cir. Jun. 5, 2009). Doc. 21. There, Thompson alleged retaliation against him for his fiancée's EEO discrimination complaint, but did not show that he had actually engaged in protected EEO activity. The Sixth Circuit held that merely being close to a complainant, without active involvement in the complaint process, is not protected by Title VII's anti-retaliation provisions. Here, the parties agree, and the Court is

According to an affidavit submitted by EEO representative Raymond Andrade, he and his partner also interviewed Andre between August 14 and 16, 2005.[6] Doc. 19 at 24-25. It is unknown when Andre first learned of Plaintiff's wife's complaint, (*see* Doc. 16, Long Dep. 56; Doc. 18-5, Ex. F-17 (Chastain Aff.) at 151), but it is undisputed that he was shown the letter during his EEO interview. Doc. 18-5, Ex. F-21 at 177.

After Andre learned of the letter, Plaintiff alleges, he began to treat Plaintiff differently and create a more hostile work environment. Doc. 18 at 3. Plaintiff describes several incidents that, he claims, demonstrated an increasingly hostile workplace.

On August 2, 2005, Plaintiff received a performance rating of "Excellent," instead of the maximum "Outstanding," for the previous review period (from July 1, 2004 to June 30, 2005). Doc. 18-3, Ex. F-5 at 51-52. Plaintiff stated in an August 8, 2005 letter that the recently departed store administrator, Sharon Parton, told him that he would have received an "Outstanding" rating were it not for Antonio Andre's (who was Parton's direct superior) insistence that Plaintiff deserved an even lower "Fully Successful" rating. *Id.* at 58. Parton and Andre allegedly agreed on a middle ground, the "Excellent" rating. *Id.* Plaintiff said at the time, "I believe this appraisal was a deliberate action taken against me by Mr. Andre." *Id.* Parton left the Wright-Patterson Commissary in late July 2005. A short time later, Plaintiff claims, several scores on the appraisal sheet he had already acknowledged and signed were lowered further without notice. Doc. 18-4, Ex. F-15 (Long Aff.) at 137.

Plaintiff also alleges that, after his wife's complaint, Andre and Ken Chastain (Andre's

---

satisfied, that Plaintiff did actively engage in protected EEO activity in support of his wife's sexual harassment claim by, at the very least, giving a statement to the Defense Commissary Agency EEO representatives. *See* Docs. 22, 23.

[6] Andre initially disputed the date of this interview claiming, based on his memory, that it was in mid-October 2005 and "was clearly not in August of 2005." Doc. 19, Andre Dep. at 26-27. After Raymond Andrade corrected his own statement, Andre revised his testimony to agree with the August 14-16, 2005 date. Doc. 19, Errata Sheet at 23-25.

subordinate and Parton's replacement as Store Administrator) changed his work schedule unfavorably so that Plaintiff closed the commissary on a regular basis; working the later schedule also prevented Plaintiff from attending many staff meetings, keeping him "out of the loop" from the department supervisors who were supposed to report to him. Doc. 18-4, Ex. F-14 at 124. Defendant responds by noting that closing the store is a standard duty for Plaintiff's position and that, although the department supervisors started their shifts much earlier in the day, Plaintiff's schedule did overlap with his department heads'.[7] Doc. 18-5, Ex. F-16 (Affidavit of Antonio Andre) at 144-45.

Also in August, Plaintiff says, the tenor of e-mails sent to him by both Andre and Chastain became more negative and "angry." Doc. 16, Long Dep. 83-84.[8]

On September 2, 2005, Chastain wrote and filed a letter of reprimand for Plaintiff's alleged failure to follow orders. Doc. 18-3, Ex. F-6 at 62. The letter asserted that Plaintiff, despite being warned after past incidents, continued to improperly schedule day shift employees to the night shift and failed to update displays on time.[9] *Id.*

On October 1, 2005, Plaintiff left the store at the end of his shift, but there were no other managers in the store; as a result, the commissary was without managerial coverage for about three hours until a night shift "quality assurance evaluator" (QAE) arrived. Doc. 16, Long Dep. 61-62; Doc. 18-3, Ex. F-6 at 64-72. Plaintiff and another witness claim that a manager was

---

[7] Furthermore, Andre disagrees that there was a change in Plaintiff's schedule; he said Plaintiff had been required to work until closing for "almost a year." *Id.* at 147a. Because this is a genuine dispute of facts, the Court will assume, for purposes of this motion only, that Defendant's work schedule was changed.

[8] Defendant argues that the "angry" e-mails sent by Andre were no different from previous e-mails, except that they were in all capital letters, and that Plaintiff's assumption about the tone Andre meant to imply "does not support" his claims of harassment. Doc. 20 at 2. Defendant does not defend the "angry" e-mails allegedly sent by Chastain. Doc. 16, Long Dep. 83. The e-mails in question are not in evidence, but, under the standards for constructive discharge, the claimant's reasonable feelings must be considered.

[9] Plaintiff does not dispute that this reprimand was put in his file, nor does he contest the factual findings that prompted it.

5

scheduled to be on duty to cover the three-hour gap and Plaintiff was not informed of a schedule change. Doc. 16, Long Dep. 64; Doc. 18-4, Ex. F-15 (Long Aff.) at 133-34; *see also* Doc. 18-3, Ex. F-6 at 68. Nevertheless, Chastain began disciplinary proceedings because, although Plaintiff's shift was over, Chastain said that Plaintiff was supposed to verify that there was a manger on duty to replace him before leaving. Doc. 18-3, Ex. F-6 at 66-67; Doc. 18-5, Ex. F-17 (Chastain Aff.) at 152.

In late September 2005, Plaintiff learned that he had prostate cancer. Doc. 18-4, Ex. F-15 (Long Aff.) at 133. Plaintiff was scheduled to attend a training class in Virginia from October 17-21, 2005; however, his cancer diagnosis would require quick testing and surgery. *Id.* at 134. Plaintiff claims that, on September 29, 2005, he told Andre of the diagnosis and that he would likely need to miss the class to be available for necessary testing and scans from his doctor in Ohio sometime the week of the class. *Id.* at 135. Plaintiff says Andre told him not to cancel the class until "the last minute" in case there was a chance his schedule would change and he could make the trip. *Id.*; Doc. 18-5, Ex. F-18 (Affidavit of Pamela Stanley) at 160. On Thursday October 13, 2005, Plaintiff says he told Andre that missing the class was necessary and Andre replied, "do what you have to do." Doc. 16, Long Dep. 84. Thus, on Friday October 14, the last possible day to cancel the trip, Plaintiff arranged to cancel and miss the class.[10] *Id.*

As a result of the October 1st closing incident and missing the training class, Plaintiff was suspended, without pay, by Chastain (Chastain proposed a three-day suspension, which was reduced to one day by Andre and, after Plaintiff fought the penalty unsuccessfully though a formal grievance process, served in late January 2006). Doc. 16, Long Dep. 69-72; *see also* Doc.

---

[10] Andre claims that Plaintiff never told him, or Chastain, of the need to miss the class until it had already begun (sometime on or after October 17) and, as a result, the commissary was unable to send a replacement to attend the class. Doc. 18-5, Ex. F-16 (Andre Aff.) at 143-44, 147a-b.

18-3, Ex. F-6 at 70-73, 76, 80-81; Doc. 18-4, Ex. F-9. Plaintiff claims that this suspension was really retaliation for his action on his wife's sexual harassment complaint. Doc. 16, Long Dep. 71-72. Plaintiff further argues that Defendant's punishment for missing the class constituted a failure to accommodate his illness.

On November 29, 2005, Plaintiff underwent surgery and he took time off work to recover. Doc. 16, Long Dep. 75-76. In late December, Plaintiff's doctor gave him clearance to return to work from 11:00 a.m. to 3:30 p.m. daily. Doc. 18-4, Ex. F-15 at 138. Although Plaintiff asked Chastain to permit this part-time work during the recovery period, Andre interrupted and informed Plaintiff that returning to work was not an option until he could close the store. *Id.* A few weeks later, in mid-January 2006, Plaintiff did return to work on his normal schedule. Doc. 16, Long Dep. 75-76.

During Plaintiff's absence, Store Director Andre was reassigned from Wright-Patterson to a facility in Puerto Rico. *Id.* 80. Store Administrator Chastain was promoted to fill the store director position and a "Mr. Mathias" was selected as the new store administrator. *Id.* 80-81. Plaintiff was not promoted to fill either vacancy nor was he demoted.[11]

On returning to work, Plaintiff learned of a break-in that occurred around January 15, 2006 (during Plaintiff's absence) in which a file cabinet containing sensitive personnel records in Chastain's office was broken and possibly opened. Doc. 18-4, Ex. F-14 at 124-25. Plaintiff claims he had to learn of the break-in from other employees because Chastain did not tell him

---

[11] Defendant argues that Plaintiff "denied that he was not promoted as a form of retaliation." Doc. 20 at 2. However, the section of Plaintiff's deposition to which Defendant cites talks only about Chastain's promotion to fill Parton's position, which occurred before Plaintiff's wife wrote her first letter. *See* Doc. 16, Long Dep. 96-98. It is unclear which times Plaintiff referred to when he said that he was "[passed] over for available promotions on two occasions." Doc. 18 at 3. There were at least two promotions that might have been available to Plaintiff, for which he was not selected, after Defendant received his wife's letter. Plaintiff did not deny retaliation when he was not promoted to fill either Andre's store director position, which opened in January 2006, or Chastain's store administrator position, which became vacant when Chastain was promoted to replace Andre as store director.

and did not seem concerned about the incident; according to Plaintiff, Chastain did not report the break-in. *Id.*; Doc. 16, Long Dep. 85-86. Plaintiff was concerned because building security was one of Plaintiff's responsibilities. Doc. 16, Long Dep. 86. Plaintiff filed a report with Wright-Patterson's security office. *Id.* He claims he was told that the break-in was a very serious breach that should have been treated with more urgency. *Id.*; Doc. 18-4, Ex. F-14 at 125. More than two weeks had passed since the break-in, so the security office allegedly told Plaintiff that it was too late to begin an investigation. Doc. 18-4, Ex. F-14 at 125. Plaintiff did file reports with Chastain's superiors and with the security manager at Defense Commissary Agency headquarters, however, he got no responses. Doc. 16, Long Dep. 87. Plaintiff says that the agency's failure to treat the security breach with appropriate seriousness exacerbated an already stressful working environment. *Id.* 86-87.

The incident that Plaintiff describes as the "straw that broke the camel's back" came around February 21, 2006 when Plaintiff was working late in his office. *Id.* 93-95. Chastain, "visibly agitated," unlocked the door and "barged" into Plaintiff's office without knocking. *Id.* Chastain allegedly "hemmed and hawed" without giving any reason for entering Plaintiff's locked office late at night. *Id.* Plaintiff says he felt "very, very uncomfortable" until Chastain left. *Id.* Plaintiff's wife was in the building, even though the store was closed, but it is unclear whether she was in his office at the time of this encounter. *Id.* 94.

Plaintiff quit two days later on February 23, 2006. *Id.* 86-87. Plaintiff initially said he quit for medical reasons, but then changed his claim to "constructive discharge" upon learning the term. *Id.* 81.

**II. Standards of Review**

Rule 56(c) allows summary judgment to be granted by a court only when there is no genuine issue of material fact and the moving party (here, the Defendant) is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show that no genuine issue of material fact exists. Fed. R. Civ. P. 56. The court must view the facts, and the inferences that flow from them, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1987); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the non-moving party is required to come forward with some significant probative evidence, which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Here, Defendant is entitled to summary judgment if Plaintiff failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Id.* at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996). If there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

However, the opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F. 2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.,* 801 F. 2d 859, 863 (6th Cir. 1986). Therefore, a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's

evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F. 3d 795 (6th Cir. 1996). "The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249.

Defendant's motion argues that Plaintiff cannot make a case for reprisal, as a matter of law, because Plaintiff cannot show that he was constructively discharged.

### III. Analysis

#### A. Retaliation

In an action for Title VII retaliation, a plaintiff may overcome a motion for summary judgment by coming forward with evidence of the elements of the action. However, since direct, overt evidence of retaliatory intent is rare, the Supreme Court has allowed plaintiffs to survive motions for summary judgment by means of a burden-shifting mechanism that begins with a plaintiff establishing a prima facie case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

"If the plaintiff is able to present a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007) (citing *McDonnell Douglas*, 411 U.S. at 802). "If the defendant meets this burden, then the burden shifts back to the plaintiff" who must show that the defendant's proffered reason is merely a "pretext" for retaliation. *Id.* at 515-16.

"The prima facie elements of a retaliation claim are similar but distinct from those of a discrimination claim." *Michael*, 496 F.3d at 595. To establish a prima facie case of retaliation, a plaintiff must show that: "(1) she engaged in activity protected by Title VII; (2) this exercise of

protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff," or the plaintiff was subjected to such severe or pervasive retaliatory harassment by a supervisor that the plaintiff is deemed to be constructively discharged; and "(4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000). Defendant here argues that Plaintiff has not met the third element because Plaintiff cannot establish that he was constructively discharged. Doc. 20.

### B. Constructive Discharge

"Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004) (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 838-39 (3d ed. 1996)). "A mere inconvenience, or an alteration of job responsibilities, or a bruised ego is insufficient." *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 886 (6th Cir. 1996).

"Constructive discharge is, at least partially, a question of law." *Yates v. Avco Corp.*, 819 F.2d 630, 636 (6th Cir. 1987) (citing *Jacobs v. Martin Sweets Co.*, 550 F.2d 364, 370-71 (6th Cir. 1977)).

To constitute a constructive discharge, the employer must (1) "deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit" and (2) "the employee must actually quit." *Moore v. KUKA Welding Sys.*,

11

171 F.3d 1073, 1080 (6th Cir. 1999).  The second prong is not disputed here; Plaintiff did quit his job.

"To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* (citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)).  "Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions."  *Id.*  Plaintiff must show that "a reasonable employer would have foreseen that [he] would resign, given the . . . harassment [he] allegedly faced." *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1249 (6th Cir. 1989); *see also Yates v. Avco Corp.*, 819 F.2d 630, 637 (6th Cir. 1987); *Neilley v. State Farm Ins. Cos.*, 1999 U.S. App. LEXIS 34580, at *19-20, 1999 WL 1281717, at *6 (6th Cir. 1999) (unpublished).

Many factors are relevant to this analysis, including "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000) (adopted by Sixth Circuit in *Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001)).  Of those seven factors "generally [considered by the Sixth Circuit] with respect to intolerable working conditions," only the sixth is implicated by the available evidence in the instant action.  *Lindsey v. Whirlpool Corp.*, 295 Fed. App'x 758, 770-71 (6th Cir. 2008) (unpublished).

"A plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context."  *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595-96 (6th Cir. 2007) (citing *Burlington N. and Santa Fe Ry. v.*

*White*, 548 U.S. 53, 67-68 (2006)). "In the retaliation context, a materially adverse employment action . . . consists of any action that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Wilson v. Potter*, No. 2:07-CV-1118, 2009 U.S. Dist. LEXIS 44118, at *29-30, 2009 WL 145178, at *10 (S.D. Ohio May 22, 2009) (internal citations omitted). "The Sixth Circuit has described this as 'a relatively low bar.'" *Id.* at *30 (quoting *Michael*, 496 F.3d at 596).

Here, Plaintiff does not allege that any single incident constituted constructive discharge; rather, he argues that the cumulative effect of the treatment he received from the Department of Defense in general, and Andre and Chastain in particular, from August 2005 through his resignation in February 2006 constituted constructive discharge. [12]

---

[12] Defendant argues that Plaintiff accuses Andre alone of retaliation, that Chastain did not retaliate against Plaintiff, and that Plaintiff admitted this in his deposition: "Q. [by defense counsel] You never got the impression that he [Ken Chastain] was reprising against you? A. [by Plaintiff] Absolutely not." Doc. 16, Long Dep. 100.; *see* Doc. 20 at 2. But, taken as a whole, Plaintiff's remarks seem to cut the other way. Right before that statement, Plaintiff said that Chastain "instigated the suspensions and the reprimands" and that Chastain was "following [Andre's] orders." *Id.* Taken in context, a reasonable reading of Plaintiff's statement (that Chastain was "absolutely not" retaliating) is that it is not an admission, instead it could reasonably explain that Chastain, though he was a participant in the alleged retaliation, did not himself have retaliatory intent. Plaintiff's remarks at that point in the deposition also appear to be referencing only late-July to early-August 2005, when Chastain first arrived at the Wright-Patterson Commissary, not the entire period for which Plaintiff alleges reprisal. *See id.* 99-100. Even taken at face value, Plaintiff's statement does not foreclose the possibility that Chastain developed retaliatory intent sometime before Plaintiff quit.

Indeed, immediately before the "absolutely not" statement in Plaintiff's deposition, Plaintiff noted that he and Chastain had difficulties from the start and did not "get along." Doc. 16, Long Dep. 98. In addition, Chastain enforced the suspension imposed under Andre's leadership in late January 2006, after Andre left Wright-Patterson. *Id.* 71. To this, Plaintiff said, "I believe Mr. Andre was the prime mover. Mr. Chastain was doing what he was told." *Id.* 72. If Chastain continued retaliatory policies and decisions of Andre, then it is no defense to say that Andre left Wright-Patterson or that Chastain himself did not intend to retaliate.

Title VII demands this Court look at the actions and intent of the "employer" (in this case, the United States Department of Defense), not merely the actions and intent of the claimant's immediate supervisor. If the actions against Plaintiff were ordered or directed by managers with ill intent, even if the actions were carried out by subordinates who had no ill intent of their own, the employing agency or company can be subject to Title VII liability. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.").

A jury could reasonably interpret Plaintiff's "absolutely not" statement to be limited, as noted above, solely to a discrete time frame early in Chastain's tenure and/or to Chastain's personal intent (or lack of intent) to retaliate. The

Plaintiff argues that his constructive discharge was caused by a combination of Defendant giving him a lower-than-expected performance review; changing his performance review after-the-fact, and without his knowledge; changing his work schedule unfavorably; holding meetings with his direct subordinates during his non-working hours; sending angry e-mails on a regular basis; attempting to suspend him for three days; actually suspending him for one day; failing to reasonably accommodate his illness; passing him over twice for available promotions; failing to respond appropriately to the break-in; and Chastain's entering Plaintiff's office.

There are genuine issues of fact as to whether, and in what manner, many of the alleged harassing incidents occurred.  However, these questions of fact only become material if, should they be accepted as true by the finder of fact, they would show that, as a matter of law, Plaintiff was constructively discharged.  If Plaintiff is unable to make a prima facie showing of constructive discharge when the available evidence is viewed in a light most favorable to him, then Defendant is entitled to summary judgment as a matter of law.

The alleged incidents of retaliation must not be reviewed separately or in a vacuum; instead, the Court must consider the "totality of circumstances."  *See Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997)). "Totality of circumstances" includes the alleged incidents, taken together, and the "surrounding conditions, influences, or forces" as well as evidence of Defendant's treatment of other employees in similar situations (if any had been presented).  *Jackson v. Quanex Corp.*, 191 F.3d

standards for summary judgment require all reasonable inferences be made in favor of the non-moving party, here the Plaintiff. Accordingly, it would be improper for this Court to assign an interpretation to Plaintiff's words at this stage when there are multiple reasonable interpretations.

14

647, 658-60 (6th Cir. 1999) (citing *Andrews v. City of Phila.*, 859 F2d 1469, 1484 (3d Cir. 1990);
Black's Law Dictionary 534 (6th ed. 1990)).

Plaintiff's allegation of constructive discharge must be measured against the objective
standard of a reasonable employee. This standard "avoids the uncertainties and unfair
discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective
feelings." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68-69 (2006). Further, the
plaintiff in a constructive discharge claim must not be unduly sensitive. *Wilson v. Firestone Tire
& Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991) (citing *Henry v. Lennox Indus. Inc.*, 768 F.2d
746, 752 n. 3 (6th Cir. 1985)).

However, the Supreme Court cautions that, because "context matters," the standard must
be that of a reasonable employee *in the Plaintiff's position*. *Burlington*, 548 U.S. at 69 (noting
that, for example, a schedule change may not be significant to many employees, yet it could
"matter enormously to a young mother with schoolage children" or that a supervisor's refusal to
invite an employee to lunch is usually trivial, but could be actionable if the subordinate is
excluded from a "weekly training lunch that contributes significantly to the employee's
professional advancement"). Applying this standard to the instant action, Plaintiff's cancer
diagnosis and treatment are relevant details. However, even when the evidence is viewed in a
light most favorable to Plaintiff, he has not made a prima facie showing of constructive
discharge.

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at
all the circumstances. These may include the frequency of the discriminatory conduct; its
severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift*

15

*Sys.*, 510 U.S. 17, 23 (1993). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75 (1998)); *see e.g. Johnson v. Rumsfeld*, 238 Fed. App'x 105, 108 (6th Cir. 2007) (unpublished) (citing *Faragher* in a claim for retaliation by constructive discharge).

### Performance Review

In the Sixth Circuit, low performance reviews and other forms of professional criticism do not create the "objectively intolerable conditions" necessary for a constructive discharge. *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) (citing *Caslin v. Gen. Elec. Co.*, 696 F.2d 45 (6th Cir. 1982); *Johnson v. Rockwell Int'l*, 1995 U.S. App. LEXIS 1558, 1995 WL 25424 (6th Cir. 1995) (unpublished)); *El-Zabet v. Nissan N. Am., Inc.*, 211 Fed. App'x 460, 464 (6th Cir. 2006) (unpublished). In *Caslin*, the Sixth Circuit rejected a constructive discharge claim based on low performance ratings because there was no evidence that the plaintiff's job was jeopardized or negatively affected as a result of the low score; further there was no evidence to show that the employer intended for the plaintiff to quit or benefited from the plaintiff's departure. 696 F.2d at 46-47. Here, Plaintiff has not shown that the lower-than-expected performance review, or its additional reductions after-the-fact, affected his job status or job duties in any way. Therefore, Plaintiff's lower-than-expected performance review and the alleged alterations to the review contribute little to showing working conditions that were so intolerable that a reasonable person must resign.

16

**Schedule Change**

Andre and Chastain's partial managing of the Plaintiff's subordinates might have been a sign of preparations to fire, demote, or marginalize Plaintiff, however, without any evidence to that effect, such an assumption would be a significant leap. Normally, taking control of an employee's subordinates is insufficient, as a matter of law, to show constructive discharge. *See e.g. Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2004) (holding that constructive discharge requires showing more than alteration of plaintiff's subordinates' schedules; refusing to allow plaintiff to authorize subordinates' overtime; prohibiting plaintiff from delegating certain duties to subordinates, even if others in plaintiff's position could delegate those duties and it significantly increased plaintiff's workload; and calling plaintiff "incompetent" in front of her subordinates). Holding staff meetings without Plaintiff present is not so intolerable that it would cause a reasonable supervisor to quit.

Further, since Andre and Chastain believed that closing the store was one of Plaintiff's standard duties, placing Plaintiff on a closing schedule, even if that did negatively impact Plaintiff's relationship with his subordinates, is a reasonable business decision. Plaintiff has not shown that any other factors motivated his schedule change, and therefore fails to show that Andre or Chastain changed his work schedule with the intent to make Plaintiff quit. Therefore, Plaintiff's changed schedule is not evidence of constructive discharge.

**E-mails**

Although the allegedly "angry" e-mails are not in evidence, anger from a superior is generally a sign of displeasure with the employee to whom it is directed. As noted above in *Agnew*, 286 F.3d 307, and *Smith*, 376 F.3d 529, criticism from a superior is normally not, by itself, objectively intolerable. In *Smith*, the Sixth Circuit held that a supervisor calling the

17

plaintiff "incompetent" and "a whiner," to her face, was insufficient to show constructive

discharge. 376 F.3d at 534. Here, Plaintiff recalls that the "angry" e-mails were in all capital

letters. Capital letters in a medium with few formal usage conventions, like e-mail, can indicate

anger, but can just as easily indicate importance, urgency, or excitement. Without more

information, e-mails merely written in all capital letters are not objectively intolerable as a matter

of law and contribute little to an overall objectively intolerable atmosphere.

### Suspension

Suspension without pay is an "adverse employment action" for the purposes of Title VII

retaliation claims. *See e.g. Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir. 2001) (holding that

plaintiff suffered adverse employment action when he was suspended without pay for fourteen

days); *White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789, 801 (6th Cir. 2004), *aff'd on other

grounds*, 548 U.S. 53 (2006) (holding that employee's suspension for over a month was

materially adverse for purposes of retaliation claim, even though she was eventually restored to

her position with back pay); *Cf. Jackson v. City of Columbus*, 194 F.3d 737, 752 (6th Cir. 1999)

(holding that a suspension *with* pay is *not* an adverse employment action). Even a one-day

suspension without pay has been found to constitute prima facie evidence of retaliation.

*Swanson v. Livingston County*, 270 F. Supp. 2d 887, 897 (E.D. Mich. 2003), *aff'd on other

grounds*, 121 Fed. App'x 80 (6th Cir. 2005) (unpublished).

For purposes of this motion, the Court will assume that a one-day suspension, without

pay, constitutes a prima facie case of retaliation. *Id.* Nevertheless, Plaintiff has not overcome

the Defendant's "legitimate, non-discriminatory reason for the suspension." *Id.* Namely,

Defendant argues that Plaintiff was disciplined for leaving the store on October 1, 2005 without

ensuring there was adequate supervision, and for missing the training course without proper

permission. Plaintiff has not offered evidence to show that either of these reasons are pretextual. *See Irvin v. Airco Carbide*, 837 F.2d 724, 726 (6th Cir. 1987) (holding that "blanket denial" of defendant's reasons is insufficient; "a plaintiff must take the extra step of presenting evidence to show that the reasons given are an attempt to cover up the employer's alleged real discriminatory motive").

Under the *McDonnell Douglas* burden-shifting rule, this Court, absent evidence of pretext from the Plaintiff, must accept Defendant's proffered "legitimate, nondiscriminatory reason" for the suspension. *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

**Failure to Accommodate Illness**

Plaintiff alleges two examples of Defendant failing to accommodate his illness. First, Defendant prevented Plaintiff from returning to work part-time in late December 2005. Plaintiff argues that, by not allowing him to return to work for a 4.5 hour period mid-day while Plaintiff finished recovery, Defendant failed to reasonably accommodate his illness and associated treatment and recovery program. Doc. 18 at 13-14. However, as noted above, Defendant considered closing the store to be an important part of Plaintiff's job. Doc. 18-5, Ex. F-16 (Andre Aff.) at 144-45. This evidence, which Plaintiff has not rebutted, negates the element of employer intent for constructive discharge. Since Defendant believed that closing the store "goes with" Plaintiff's job, there was no intent to discharge or constructively discharge when the Defendant required that Plaintiff be able to perform that function before returning. *Id.*

Second, Defendant suspended Plaintiff for one day without pay, motivated, in part, by Plaintiff's failure to secure permission to miss the training course. Plaintiff claimed he had to miss the course in order to be in the area for testing related to his surgery. However, nothing in

19

evidence shows that Defendant was unsympathetic to Plaintiff's condition, merely that Andre wanted Plaintiff to be sure that cancellation was absolutely necessary before authorizing the cancellation. Plaintiff then claims that he did get permission to cancel, which Defendant disputes.

However, even if Plaintiff did get permission, it is unclear what part of the harm that came to Plaintiff is attributable to the penalty for missing the training class. He was in the area for his tests and the suspension was imposed for both missing the class and leaving the store unsupervised. There is no evidence showing what proportion of the suspension decision was motivated by each event.

The proportion of the decision motivated by each event is not relevant to this motion since Plaintiff offers no evidence showing that the suspension, even if impermissibly imposed, was intended to make Plaintiff quit. In fact, Defendant's actions belie the notion that the Department of Defense intended to force Plaintiff out: Andre reduced the suspension from three days to a single day, Defendant provided a formal grievance procedure for Plaintiff to contest the penalty, and Chastain gave Plaintiff some flexibility in scheduling the date on which he would serve the suspension. Defendant could not reasonably foresee that the suspension would cause Plaintiff to quit, nor would a reasonable employee find the penalty (though it was a materially adverse employment action) to be so objectively intolerable that their only reasonable option would be resignation.

**Failure to Promote**

Without more specific evidence that Plaintiff was "driven out" of his prior position, Defendant's mere failure to promote him to the store director or store administrator positions cannot support a constructive discharge claim. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996)

(rejecting a constructive discharge claim where plaintiff argued that failure to promote her to "her rightful position created intolerable work conditions"). As the *Hartsel* court explained, "failure to promote" and "constructive discharge" must be separate claims, else "every person passed over for a purportedly deserved promotion could bring an illegal discharge suit, and the distinction between the two would be erased." *Id.*

### Response to the Break-In

Although building security was one of Plaintiff's responsibilities as store manager, he has not shown any evidence that he suffered any adverse employment action, harassment, increased workload, or any harm whatsoever from Defendant's response (or lack thereof) to the break-in. Plaintiff was not blamed for the security breach, nor was he tasked with any investigatory or repair duties. The available evidence indicates that Plaintiff's response to the security breach was entirely on his own initiative. No reasonable employee would consider the ignoring of a break-in to contribute to the creation of an objectively intolerable work environment when no consequences fell on him as a result.

### Entering Plaintiff's Office

Finally, Chastain's entry into Plaintiff's office, the supposed "last straw" which drove Plaintiff to quit, was neither "severe" nor "pervasive" enough to create intolerable working conditions. *See Ejikeme v. Violet*, 307 Fed. App'x 944, 950-51 (6th Cir. 2009) (unpublished) (where supervisor who made frequent, unannounced visits to claimant's office and "exhibited anger" did not create intolerable working conditions); *Lindsey v. Whirlpool Corp.*, 295 Fed. App'x 758, 771 (6th Cir. 2008) (unpublished) (harassment must be "severe and pervasive" to cause a reasonable employee to quit; a single incident is rarely sufficient) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). Chastain's entry was a minor one-time

21

occurrence and, therefore, neither "severe" nor "pervasive." Plaintiff has presented no evidence as to what Chastain intended by entering Plaintiff's office. If, as Plaintiff indicates, Chastain did not expect Plaintiff to be in the office, then it is not a reasonable inference to think that Chastain entered with the intent to make Plaintiff quit his job.

**Totality of the Circumstances**

While the individual events Plaintiff identifies do not show objectively intolerable working conditions independently, the Court must consider the "totality of circumstances." *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). However, this analysis also cuts against the Plaintiff.

The alleged events occurred sporadically across a nearly seven-month period between August 2005 and February 2006. While a lack of concentration is not a bar to constructive discharge, it does tend to indicate a lack of intent on behalf of the Defendant--if the Department of Defense intended to make Plaintiff quit, it is unlikely that its efforts would be as dispersed and watered down as the events here.

Further, both the concentration and severity of the incidents fell as time passed. In August 2005, Plaintiff alleges he received the lower-than-expected performance review, the review was changed without notice, his schedule was changed, and the negative e-mails started. In September, Plaintiff was reprimanded for failing to follow instructions and was told to delay cancelling his training course. In November, Plaintiff was notified of a planned three-day suspension for leaving the store unsupervised and missing his class (both in October). Plaintiff was off work, recovering from surgery, from the end of November 2005 until mid-January 2006. Plaintiff was kept from returning to work from late December until he was able to fully do his job in mid-January. But, during Plaintiff's absence, Antonio Andre, who was responsible for

22

most of the alleged hostility Plaintiff felt, left Wright-Patterson Air Force Base through a permanent reassignment. In January, Plaintiff served his suspension, which had been reduced to one-day, and continued working. More than a month later, in late February 2006, Chastain entered Plaintiff's office, said nothing of significance, then left. Of all the events to identify as the "last straw," the February office entry is the weakest.

Taken together, a reasonable employee would not find this smattering of events to be objectively intolerable. Indeed, it appears that Plaintiff's situation dramatically improved when he returned to work in January 2006. The supervisor he most disliked was gone, he suffered no punishments or reprimands (save the execution of the suspension that had been imposed more than a month earlier, and even that was two-thirds shorter than initially proposed), and Plaintiff could look toward the future with no remaining baggage from the incidents of the last half of 2005. In short, there was no "severe or pervasive" conduct by Defendant to show a violation of Title VII, and both the severity and pervasiveness decreased following Plaintiff's return from surgery.

Furthermore, Plaintiff has not shown any intent by the Defendant to force Plaintiff to quit. Nor has Plaintiff shown that his departure was a foreseeable consequence of Defendant's actions. If there was any foreseeable chance that Plaintiff would quit because of the events in 2005, it was avoided when Plaintiff returned to work without incident in 2006. At the time Plaintiff alleges he was constructively discharged, late February 2006, there was no evidence to alert the Defendant that Plaintiff was dissatisfied or on the verge of quitting.

## IV. Conclusion and Order

Even when the available evidence is viewed in a light most favorable to the Plaintiff, he has failed to show either of the two prongs necessary to prove constructive discharge: that his

working conditions would be "objectively intolerable" to a reasonable employee in a similar position, and that Defendant intended to force his resignation.  Plaintiff alleged that he suffered retaliation by means of constructive discharge.  Therefore, having failed to submit facts that could show constructive discharge, Plaintiff cannot, as a matter of law, prove retaliation in violation of Title VII.  Accordingly, Defendant Robert Gates is entitled to summary judgment.

Defendant's motion for summary judgment (Doc. 14) is GRANTED.  The instant case is DISMISSED and shall be terminated from the docket of the United States District Court for the Southern District of Ohio, Western Division at Dayton.

**DONE** and **ORDERED** this Thirteenth day of August, 2009.

**/s/ Thomas M. Rose**
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE